

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 1 1 2024

CLERK, U.S. DISTRICT COURT
By_____
                    Deputy

UNITED STATES OF AMERICA

v.

DR. HECTOR UBALDO (01)

No.

**4-24CR-222-P**

## INDICTMENT

The Grand Jury charges:

At all times relevant to this Indictment:

<u>Introduction</u>

1.    The defendant, **Dr. Hector Ubaldo**, and others engaged in a scheme whereby **Dr. Ubaldo** solicited and received illegal kickbacks in exchange for the referral of prescribed tests (i.e. blood and toxicology) to laboratories controlled by other conspirators.

2.    These kickbacks were funneled to **Dr. Ubaldo** in a variety of ways, including cash payments, fraudulent professional services agreements, and other forms.

3.    As a result of these kickbacks, laboratories were able to bill more than $3.4 million to federal government healthcare programs.

**Defendant and Related Entities**

4.    **Dr. Ubaldo** was a licensed Physician in the State of Texas.  **Dr. Ubaldo** was the owner of Hector Ubaldo, M.D., P.A.  **Dr. Ubaldo** specialized in Internal Medicine and Family Practice.

Indictment – Page 1

5.    RK Clinical Solutions, LLC ("RK Clinical"), was an independent clinical diagnostic testing laboratory. RK Clinical was founded in approximately 2014, by two previously-indicted co-conspirators, Kelly Nelson and Renee Field. (*See* Case Nos. 4:23-cr-321-Y and 4:23-cr-322-Y.) RK Clinical was authorized by federal health care programs, including Medicare, to perform laboratory testing services. RK Clinical performed toxicology and blood tests ordered by medical providers across the U.S., including the state of Texas, and in the Fort Worth Division. RK Clinical ceased operations in approximately 2023, which was, in part, a result of the federal investigation.

6.    Cirrus DX, Inc. ("Cirrus") was an independent clinical diagnostic testing laboratory that was formed in 2019 and performed urinalysis testing.

7.    Redwood Lab Services, LLC ("Redwood") was a reference laboratory. Redwood contracted with Huntsville Memorial Hospital (HMH), who ran the actual tests for Redwood, and Redwood billed the insurance programs. Redwood primarily provided laboratory services for genetic testing sent by physicians.

8.    An individual identified here as G.M. was employed by RK Clinical as a marketer from approximately 2019 to 2022. In approximately May 2020, G.M. introduced **Dr. Ubaldo** to the services offered by RK Clinical, and **Dr. Ubaldo** began ordering certain toxicology tests for his patients to be performed by either RK Clinical, Cirrus, or Redwood in exchange for kickbacks.

### Federal Insurance Program

9.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost healthcare benefits to certain individuals, primarily the elderly, blind, and disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").  Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, nurses, and other healthcare providers, including laboratories, such as office visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.  Medicare Part C, also known as Medicare Advantage, was another Medicare health plan offered by private companies. Medicare paid a fixed amount each month to the private companies, and in return these companies followed rules set by Medicare. Medicare Part C included the same coverage as Medicare Part B.

10.      For a laboratory to become enrolled in Medicare, it must submit a Medicare enrollment application.  CMS regulates all laboratory testing through the Clinical Laboratory Improvement Amendments ("CLIA") regulations, which establish standards for laboratory testing covered and paid for by Medicare.  Once they have received CLIA accreditation, they may apply to Medicare to be a health care provider to receive payment for health care services provided.  In applying to Medicare, health care providers certify they understand and will abide by the federal laws and regulations governing their participation in Medicare, including a specific understanding of 42 U.S.C. § 1320a-7b(b), also known as the Anti-Kickback Statute.

11.     Medicare was a "health care benefit program," as defined in Title 18 United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

12.     Physicians, nurse practitioners, and other healthcare providers, including laboratories, could file a claim for reimbursement for Medicare where appropriate.

### Anti-Kickback Law

13.     The Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b), prohibited any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending, or arranging for federally-funded medical services.  For example, and in the simplest sense, the statute prohibited a laboratory from paying a doctor cash in exchange of the referral of a large volume of tests.

14.     The purpose of the Anti-Kickback Statute was to ensure that referral decisions are made solely with the goal of a patient's well-being.  Referring patients based on the expectation of personal profit corrupts the health care system because it encourages medical providers and others to make referral decisions for reasons relating to personal profit rather than a patient's best interests. The payment of kickbacks also corrupts the health care system because they have the effect of generating business for the dishonest provider at the expense of the honest provider who refuses to pay cash kickbacks.

15.     Under the Anti-Kickback statute, certain activities are covered by the Safe Harbor Provisions, set forth in 42 CFR 1001.952(d)(4) – meaning such activities will not be deemed illegal remunerations under the Anti-Kickback Statute.

16.     These safe harbors include certain "personal service and management contracts." To qualify under the safe harbor, however, the contract for the services or management must be for "not less than one year," must be "set in advance," must be "consistent with fair market value in arms-length transactions," and "is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties."

Count One
Conspiracy to Pay and Receive Health Care Kickbacks
(Violation of 18 U.S.C. § 371)

17.    The allegations contained in paragraphs 1 to 16 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

18.    Beginning in or around June 2020 and continuing through in or around June 2023 in the Fort Worth Division of the Northern District of Texas and elsewhere, the defendant, **Dr. Hector Ubaldo,** did knowingly and willfully conspire and agree with other persons both known and unknown to the Grand Jury, to commit and abet certain offenses against the United States:

a.    to violate the Anti-Kickback statute by knowingly and willfully soliciting and receiving any remuneration, including any kickback, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, namely Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A); and

b.    to violate the Anti-Kickback statute by knowingly and willfully soliciting and receiving any remuneration, including any kickback, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, leasing, ordering, and arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, namely Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(1)(B).

## Object of the Conspiracy

19.     The object of the conspiracy was for the defendant and others to unlawfully enrich themselves and others through a kickback scheme.

20.     More specifically, defendant **Dr. Ubaldo** received kickbacks from other conspirators, in exchange for his referral of patients to RK Clinical, Cirrus, and Redwood.

## Manner and Means of the Conspiracy

21.     The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

a.     **Dr. Ubaldo** saw patients during regular intervals for wellness checks, sick visits, or other reasons.  During the medical appointments, **Dr. Ubaldo** conducted medical services and determined whether additional services, including diagnostic testing should be ordered.

b.     Once the specimen was received, the lab (such as RK Clinical, Cirrus, and Redwood) conducted the prescribed diagnostic test.

c.     After performing the tests, the labs (RK Clinical, Cirrus, and Redwood) billed insurance entities (including Medicare) and sought reimbursement.    These reimbursements were the primary source of income for RK Clinical, Cirrus, and Redwood. Thus, the number of tests each of these performed directly correlated to their profits.

d.     In an effort to maximize their profits, owners and operators of these laboratories, such Nelson and Field (who owned and operated RK Clinical), sought to financially incentivize medical providers to send additional tests to RK Clinical by

providing them with illegal financial incentives that were, at times, disguised to appear as legitimate business transactions.

e.      Laboratories utilized marketers, including the individual identified herein as G.M., to make the kickback payments to physicians, like Dr. Ubaldo. Marketers were also paid a percentage of the claims that they were successful in having referred to a specific laboratory.

## Overt Acts

22.     In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Northern District of Texas, and elsewhere, at least the following overt acts, among others:

a.      On or about July 19, 2022, **Dr. Ubaldo** met with G.M. at Dr. Ubaldo's office. During this meeting, G.M. paid **Ubaldo** $5,930 in cash based upon the volume and value of **Ubaldo's** clinical laboratory testing to a laboratory that G.M. selected. Conversations between **Dr. Ubaldo** and G.M. were recorded during this meeting.

b.      On or about August 24, 2022, G.M. paid **Dr. Ubaldo** $3,580 in cash based upon the volume and value of **Dr. Ubaldo's** clinical laboratory testing to a laboratory that G.M. selected.  **Dr. Ubaldo** was frustrated with the amount of money he was being provided, but he accepted the money, placing it in a soft leather, messenger style bag. Photographs of the cash were taken and conversations between Dr. Ubaldo and G.M. regarding this proposed arrangement were recorded.

**Indictment – Page 8**

c.      On or about October 19, 2022, G.M. paid **Dr. Ubaldo** $3,370 in cash in exchange for **Dr. Ubaldo** referring orders for clinical laboratory testing to a laboratory that G.M. selected. **Dr. Ubaldo** again complained about the amount and demanded additional payments, stating that he needed to be paid at least $10,000 per month. **Dr. Ubaldo** and G.M. discussed a professional services agreement as a vehicle to achieve these payments. Conversations between **Dr. Ubaldo** and G.M. regarding this proposed arrangement were recorded.

d.      On or about November 29, 2022, G.M. paid **Dr. Ubaldo** $1,610 in cash in exchange for **Dr. Ubaldo** referring orders for clinical laboratory testing to a laboratory that G.M. selected. **Dr. Ubaldo** and G.M. again discussed a professional services agreement as a vehicle to achieve these payments. **Dr. Ubaldo** complained about laboratories "making all of this money off of me" and threatened to cut off referrals unless a payment of at least $5,000 was made.

e.      Because **Dr. Ubaldo** often complained that the amounts of kickbacks he was receiving were insufficient, individuals who operated RK Clinical, G.M., and **Dr. Ubaldo** agreed that they could utilize a professional services agreement as another vehicle to pay larger amounts of kickbacks and discussed this in recorded conversations.

f.      On or about August 24, 2022, G.M. and **Dr. Ubaldo** discussed a professional services agreement as a method of increasing revenue to **Dr. Ubaldo**. But as **Dr. Ubaldo** knew, the professional services agreement would be a sham and he would perform no services in exchange for the medical directorship payments. Instead, he would continue to submit orders for clinical laboratory testing to a laboratory that G.M. selected, including

Indictment – Page 9

RK Clinical, who was making the medical directorship payments. Conversations between **Dr. Ubaldo** and G.M. regarding this proposed arrangement were recorded.

g.      On or about June 1, 2020, **Dr. Ubaldo** entered into a "professional services agreement" with an entity controlled by G.M.  Per the agreement, **Dr. Ubaldo** was supposed to provide consulting services to G.M.'s company in exchange for $7,000 a month.  In reality, **Dr. Ubaldo** provided no such services.

h.      On or about December 7, 2022, **Dr. Ubaldo** entered into a "professional services agreement" with RK Clinical.  **Dr. Ubaldo** was supposed to provide consulting services to RK Clinical in exchange for $5,000 a month.  In reality, **Dr. Ubaldo** provided no such services.

i.      In total, **Dr. Ubaldo** received approximately $239,000 for consulting services under his "professional services agreements" with the entity controlled by G.M. and RK Clinical.

j.      RK Clinical submitted the professional services kickbacks to **Dr. Ubaldo** through wire payments, including a $5,000 payment on December 16, 2022, and another $5,000 payment on January 24, 2023.

k.      On or about November 3, 2022, in a text exchange, **Dr. Ubaldo** and G.M. discussed backdating the agreement between **Dr. Ubaldo** and RK Clinical. **Dr. Ubaldo** demanded that the payment from RK Clinical be made at the beginning of each month and specifically discussed the connection between the samples he was sending to RK Clinical and the kickback payments, in the form of "advisory" payments.

l.     In December 2022, **Dr. Ubaldo** and G.M. discussed the "hours logs" to justify the professional services agreement payments.

m.     On or about December 15, 2022, in a recorded telephone conversation regarding the hours log, G.M. requested that **Dr. Ubaldo** complete the "hours log" so that they could have a document justifying the payments to **Dr. Ubaldo**. **Dr. Ubaldo** protested and stated that RK Clinical should complete his hours sheet for him, even though he was not working any hours or communicating to RK Clinical that he was working any hours.

n.     Later, **Dr. Ubaldo** signed a "Medical Director/Consultant Activity Log" before it was completed so that it could be used to justify payments to **Dr. Ubaldo**. The Medical Director/Consultant Activity Log had blank spaces to fill out the date of invoice, medical director name, medical director address, dates of service, number of hours, service code and descriptions to justify the hours logged, total hours worked, invoice amount, and date. The signature space for medical director was already completed with **Dr. Ubaldo's** signature.

o.     In text messages, including one on July 6, 2022, **Dr. Ubaldo** requested that G.M. delete all of their texts, in an effort to conceal the illegal kickback scheme.

In violation of Title 18 United States Code, Section 371.

<u>Count Two</u>
Soliciting and Receipt of Illegal Kickbacks
(Violations of 42 U.S.C. § 1320a-7b(b)(1)(A) and 18 U.S.C. § 2)

23.    The allegations contained in paragraphs 1 through 16 are realleged and fully incorporated herein.

24.    Beginning in or around June 2020 and continuing through in or around June 2023, in the Fort Division of the Northern District of Texas and elsewhere, defendant **Dr. Hector Ubaldo** knowingly and willfully solicited or received remuneration, that is, kickbacks, directly and indirectly, overtly and covertly, in return for the furnishing and arranging for the furnishing of testing samples for blood and toxicology testing to RK Clinical, for which payment could be made in whole or part under a federal health care program, namely Medicare.

In violation of 42 U.S.C. §1320a-7b(b)(1)(A) and 18 U.S.C. § 2.

## Forfeiture Allegation
(18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c))

25.     The allegations contained in the Introduction and Counts One and Two of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures to the United States of America of certain property in which the defendants have an interest.

26.     Upon conviction of any Federal health care offense, the defendant, **Dr. Hector Ubaldo**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

27.     Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred, or sold to, or deposited with a third party;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value; or

      e.  has been commingled with other property which cannot be subdivided without difficulty;

28.     It is the intent of the United States to seek the forfeiture of other property of the defendant up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the names of the defendant, **Dr. Hector Ubaldo**.

29.    By virtue of the commission of the offense alleged in this Indictment, any and all interest the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c).

30.    All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)97), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C § 982(b)(1).

A TRUE BILL.

_____
FOREPERSON

LEIGHA SIMONTON
UNITED STATES ATTORNEY

_____
P.J. MEITL
Assistant United States Attorney
D.C. Bar No. 502391
801 Cherry Street, 17th Floor
Fort Worth, Texas 76102
Telephone: 817.252.5272
E-mail: philip.meitl@usdoj.gov

**Indictment – Page 14**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THE UNITED STATES OF AMERICA

v.

DR. HECTOR UBALDO (01)

INDICTMENT

18 U.S.C. § 371
Conspiracy to Pay and Receive Health Care Kickbacks
Count 1

42 U.S.C. § 1320a-7b(b)(1)(A) and 18 U.S.C. § 2
Soliciting and Receipt of Illegal Kickbacks
Count 2

18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c)
Forfeiture Notice

A true bill rendered

FORT WORTH                                                FOREPERSON

Filed in open court this 11th day of September, 2024.

Defendant on conditions of release.

------------------------------------------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
Magistrate Number: 4:24-MJ-659-BP